774 So.2d 1227 (2000)
Denise L. FRAZER, Individually and on Behalf of, as Natural Tutrix of Her Minor Son, Andrew M. Cundiff
v.
ST. TAMMANY PARISH SCHOOL BOARD; W.C. Percy, Jr.; William R. Morgan, II; Gwen A. Hopper and Robert Cerise.
No. 99 CA 2017.
Court of Appeal of Louisiana, First Circuit.
December 22, 2000.
*1229 Charles M. Hughes, Jr., Mandeville, for Plaintiffs/Appellees, Denise L. Frazer and Andrew M. Cundiff.
Harry P. Pastuszek, Jr., Mandeville, for Defendant/Appellant, St. Tammany Parish School Board.
Before: CARTER, C.J., GONZALES, PARRO, WEIMER, and FONTENOT,[1] JJ.
CARTER, C.J.
The St. Tammany Parish School Board (School Board) appeals a judgment finding it was completely at fault for the injuries sustained by a student involved in a fight after disembarking a school bus. The trial court awarded the former student $75,000.00 in general damages and awarded his mother $5,000.00 for her loss of consortium and $6,058.36 in special damages.

FACTS
On September 17, 1993, Andrew Cundiff (Andy), a freshman at Northshore High School, was being transported on a school bus driven by Robert Cerise. During the trip home, Andy and his friend, Eric Fox, were harassed and threatened by other students from his school, specifically Josh Julian, Joe Julian, and Eric Costello. The threats originated from an incident earlier in the week when Andy defended another student, Rachel Main, who also had been harassed by Joe Julian on the bus.
*1230 Because Andy and Eric Fox feared the prospect of fighting with the Julian boys, they decided to get off the bus at the home of their friend, Carlos Gierlings. Andy thought getting off at that stop, as opposed to his own regular stop, was the safest solution, because Carlos' house was located close to the bus stop and Carlos' mother was home at that time of day. When the bus stopped near Carlos' house, Andy, Eric Fox, and Carlos got off the bus and were followed by another group of students consisting of Joe Julian, Josh Julian, Curtis Martin, James Embree, and Kevin Knatt. Two other students, Stephen Shockley and Eric Costello, who had left the bus at an earlier stop, followed the bus to the next stop in anticipation of a confrontation between the Julians and Andy Cundiff and Eric Fox.
After Andy got off the bus, he started walking towards Carlos Gierlings' house. After walking a few feet, Andy turned around and saw Josh Julian hit Eric Fox twice in the mouth. Andy noticed Joe Julian was also moving towards Eric Fox. In an attempt to break up what Andy perceived as an unfair fight, Andy ran back towards the group to intercept Joe Julian. As Andy approached the group, he grabbed Joe Julian by the collar to prevent him from getting closer to Eric Fox. However, Andy slipped, and he and Joe both fell to the ground. Once Andy was on the ground, he was kicked and beaten by Joe Julian, Josh Julian, and Eric Costello. By all accounts, Andy was in a defensive position as the three boys beat him.
The boys stopped beating Andy after someone threatened to call the police. Andy was able to make his way to his friend's house after the Julians and Eric Costello left the scene. After Andy's mother, Denise Frazer, was informed of the incident, she arrived at Carlos' house and took Andy to the hospital. Frazer also notified the police of the incident.
As a result of his injuries, Andy was bedridden for three to four days and received homebound instruction for the remainder of the school year. Denise Frazer filed a lawsuit individually, and on behalf of her son, seeking damages for the injuries Andy sustained and her loss of consortium. Named as defendants were the School Board, W.C. Percy, Jr.,[2] William R. Morgan, II,[3] Gwen A. Hopper,[4] Robert Cerise, Josh Julian, the parents of Joe Julian, the parents of Eric Costello, and the parents of Stephen Shockley.
Before trial, the plaintiffs voluntarily dismissed defendants Dwayne Shockley and Charlene Shockley, the parents of Stephen Shockley, and their insurer, State Farm Fire and Casualty Insurance Company. The plaintiffs also voluntarily dismissed Josh Julian, John and Mary Julian, the parents of Joe Julian, and Eric and Jane Costello, the parents of Eric Costello, Jr., and substituted Andrew Cundiff as a proper party plaintiff, because he had reached the age of majority.
On September 17, 1998, the matter proceeded to trial against the remaining defendants: the School Board, W.C. Perry, Jr., William R. Morgan, II, Gwen A. Hopper, and Robert Cerise. Following the trial, the trial court rendered judgment solely against the School Board in the amount of $75,000.00 as general damages for injuries sustained by Andy, and $5,000.00 to Denise Frazer for loss of consortium, as well as $6,058.36 in special damages. The School Board appeals, assigning error with the trial court's assessment of total liability on the School Board; the trial court's failure to determine the degree of fault of all parties causing or contributing to the plaintiff's injuries; the trial court's failure to apply principles of *1231 comparative fault; and the amount of the trial court's award of damages to the plaintiffs.

DISCUSSION

The Trial Court's Failure to Apply Comparative Fault
The School Board argues that the trial court failed to apply the principles of comparative fault, which are set forth in the current version of LSA-C.C. art. 2323 as follows:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
The plaintiffs argue that the same public policy considerations that allowed a trial court the discretion to compare the fault of fewer than all persons responsible for an injury that were used in Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94), 650 So.2d 712, are applicable in the present case. We disagree.
The discretion once afforded trial courts in comparing the fault of fewer than all persons responsible for an injury, whether they were a party to the action or whether their identity was known, has been eliminated. The language of Article 2323 was changed as a result of a 1996 amendment. 1996 La. Acts, 1st Ex. Sess., No. 3, § 1. The Louisiana Supreme Court in Keith v. United States Fidelity & Guaranty Company, 96-2075, pp. 5-7 (La.5/9/97), 694 So.2d 180, 182-83, stated:
Comparing La. Civ.Code art. 2323, as amended, to its predecessor, it is apparent that the basic structure for comparative fault is unchanged. However, we observe that the Legislature added more specific language to Art. 2323 making it mandatory for the determination of the percentage of fault of all persons contributing to an injury, whether those persons are unidentified non-parties, statutorily immune employers, or others.
* * * * * *
After carefully considering Act 3, we find that the legislative amendment of La. Civ.Code art. 2323 was procedural legislation. Act 431 of 1979 amended and reenacted La. Civ.Code arts. 2103, 2323, and 2324 to usher a comparative fault system into Louisiana. This act eliminated the doctrine of contributory negligence and provided the framework for a comprehensive scheme of loss apportionment in multi-party litigation. Since the adoption of a pure comparative fault system, it has been the task of the factfinder to allocate shares of negligence.
Keith, 694 So.2d at 182-83 (citations omitted).
Following the supreme court's determination in Keith, we find the trial court committed legal error in not comparing *1232 the fault of those involved in the actual fight that produced the injuries to Andy Cundiff with those who should have known that the fight was likely to occur. Where the trial court commits legal error by applying an incorrect legal standard, this court is required to determine the facts de novo from the entire record and render a decision on the merits. Bell v. Ayio, 97-0534, p. 4 (La.App. 1st Cir.11/13/98), 731 So.2d 893, 897, writ denied, 98-3115 (La.2/5/99), 738 So.2d 7. Therefore, based on the legal error made by the trial court, we review liability in this case de novo.

Actions of the School Board and the School Board Employees
It is well established that a school board, through its agents and teachers, is responsible for reasonable supervision over students. However, this duty to supervise does not make the board the insurer of the safety of the children. Furthermore, constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision. Before liability can be imposed upon a school board, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Further, the unreasonable risk of injury must be foreseeable, constructively or actually known, and preventable, if the requisite degree of supervision had been exercised. Said differently, educators are required to exercise only that supervision and discipline expected of a reasonably prudent person under the circumstances at hand. Obviously then, the failure to take every precaution against all foreseeable risk of injury does not necessarily constitute negligence. It is well established that the fact that each student is not personally supervised every moment of each school day does not constitute fault on the part of the school board or its employees. Bell, 731 So.2d at 899.
The record reflects that a few days before the incident, Rachel Main's mother, Linda Hall, telephoned Northshore High School out of concern for her daughter and the events on her bus. Hall spoke to Gwen A. Hopper, one of the assistant principals at Northshore High School. Hall indicated she was concerned that her daughter, who had just moved from California to Slidell, was having problems adjusting to her new surroundings.
According to Hall, Rachel had complained that she was experiencing problems on the school bus with a group of boys who were teasing her every day. Hall testified that she told Hopper that her daughter had been teased, then threatened, and that a boy named "Andy," who had defended her, also had been threatened. Hall did not know the last names of any of the students, but indicated that the father of one of the boys involved owned a liquor store on Frontage Road in Slidell, and that maybe there was an "Eric" or "Andy" involved.
After the phone call, Hopper spoke with Rachel. According to Hopper, Rachel did not appear to be upset about anything said to her by other students nor did she seem to acknowledge any problems on the bus. Hopper was able to identify one of the boys possibly involved as Stephen Shockley, because she knew his father owned a liquor store on Frontage Road.
Stephen Shockley was summoned to the office of Dr. William Morgan, who was the school disciplinarian. Dr. Morgan testified that he spoke with Stephen, who claimed to know nothing about an impending fight between the students on the bus. After this meeting, no further attempt was made to locate the student Hall identified as "Andy" as being the target of a potential fight. Hopper testified that no further action could be taken because the school day had ended and it was time to leave. At that time the School Board did not prepare a list of students who would ride a particular bus, so Hopper had no information on who the student could be.
*1233 However, it was the policy of the School Board to take as many steps as possible to prevent a fight when they received information that one was likely to occur. Dr. Morgan testified that if there was going to be a problem on the bus, the procedure was to notify the bus driver. However, in this case Dr. Morgan indicated he was not told by Hopper that the problems between the students were taking place on the bus. As a result, the bus driver, Robert Cerise, was never contacted about the possibility of a fight on his bus.
Cerise testified that had he been informed of the likelihood of a fight, he would have tried to be more aware of what the students were doing on the bus that afternoon. There was testimony from several witnesses that throughout the ride home, Josh Julian, Joe Julian, and Eric Costello made loud threats directed toward Andy Cundiff and Eric Fox, who were seated in the back of the bus. Carlos Gierlings testified that he thought the threats were loud enough for everyone on the bus to hear, since the group making the threats was seated in the middle of the bus and Andy and his friends were in the back of the bus. Andy Cundiff testified that objects were thrown at him and his friends from the group seated half a buslength away. Despite the testimony of several witnesses who indicated everyone on the bus knew there was going to be a fight, Cerise testified he did not hear any threats or get any indication there was a problem on his bus that afternoon.
The record also indicates that there were several unauthorized students riding on the bus that afternoon. The students did not normally ride this particular bus and did not have written permission in accordance with School Board policy to ride that particular bus on that afternoon. These students boarded the bus to observe the expected confrontation between the Julians and Andy Cundiff. Although Cerise testified he made an attempt to know his riders by eyesight, he failed to notice the presence of the increased number of riders.
According to Carlos Gierlings, everyone on the bus knew there was going to be a fight. He testified that three people regularly got off the bus at his stop, but on that afternoon, as many as eight boys got off the bus. Although Cerise testified that students who got off at a stop other than their regular stop would "raise a flag" in his mind that there was a problem, he failed to notice the increased number of students who left the bus at the stop near Carlos Gierlings' house.
Based on our review of the record, we find the School Board, through its employees, did not follow its own policies of preventing a fight where it had advance notice that there was a problem. Had Cerise been informed by the School Board employees of the potential problem between students on his bus, he could have paid better attention to his riders and prevented unauthorized riders from boarding his bus. At the very least, the absence of students expecting a confrontation could have diminished the possibility of a fight. Further, had Cerise noticed the large group of boys leaving the bus where normally only three left, he could have taken steps to prevent the fight. Significantly, there was substantial testimony that the confrontation broke out not far from the bus and within view of Cerise, who, instead of taking preventative measures, drove away.
The testimony in the record indicates that Joe Julian, Josh Julian, Eric Costello, and Stephen Shockley were all older and physically bigger than Andy. Cerise should have noticed the threats were directed at two smaller students by students who were larger and accompanied by several friends. Such a scenario was more than likely to result in injury to the smaller, outnumbered students, given the threats of physical confrontation that were made during the bus ride. Accordingly, we find the School Board to be 20% at fault in causing the injuries sustained by Andy Cundiff.

*1234 Actions of Josh Julian, Joe Julian, and Eric Costello
A battery is harmful or offensive contact to another without that person's consent, done with intent to cause the person to suffer such a contact. In a civil battery case, the burden of proof is on the plaintiff to establish that a battery was committed. The law is well-settled that in actions for damages for battery, a plaintiff cannot recover if the evidence establishes he was at fault in provoking the difficulty in which he is injured, unless the person responding uses excessive force. Under LSA-C.C. art. 2315 the proper standard to evaluate a defendant's action is whether the conduct was that generally required of a reasonable man under like circumstances. Robinson v. Dunn, 96-0341, p. 5 (La.App. 1st Cir.11/8/96), 683 So.2d 894, 897, writ denied, 96-2965 (La.1/31/97), 687 So.2d 410.
Although Andy Cundiff first made contact with Joe Julian, Andy's explanation that he grabbed Joe Julian in an attempt to keep him from outnumbering Eric Fox in the confrontation satisfies this court that Andy was not the aggressor. We further find that Joe Julian, Josh Julian, and Eric Costello far exceeded what was required of reasonable people under the circumstances when they repeatedly kicked Andy in the head after he was lying on the ground in a defenseless position. We find the intentional actions of Joe Julian, Josh Julian, and Eric Costello make them each 25% at fault for the injuries sustained by Andy Cundiff, for a total of 75% fault.

Actions of Andy Cundiff
The trial court assigned no comparative negligence to Andy Cundiff. The School Board contests this decision, arguing that Andy was the aggressor and he should be barred from recovery. Courts have recognized that there may be certain conduct that, while not justifying the battery complained of, may be of such a nature under the circumstances to have provoked or contributed to the incident. Wijngaarde v. Parents of Guy, 97-2064, p. 13 (La.App. 4th Cir.9/2/98), 720 So.2d 6, 12, writs denied, 98-3144, 98-3152, 98-3162 (La.2/12/99), 738 So.2d 574 and 575.
In this case, we do not find that Andy was the aggressor in the fight. Andy had previously been threatened and harassed by the Julian brothers and only chose to physically confront Joe Julian in an attempt to prevent him from attacking Eric Fox, who was already being struck. However, we do find that Andy could have informed the bus driver of the threats directed at him on the way home, before he got off the bus. Although such an action may not have prevented the fight, it would have allowed the bus driver to take steps to keep the groups separated. Andy's failure to inform the bus driver of the threats made against him warrants the imposition of 5% fault to him for contributing to his own injuries.

Damage Awards
Andy remained bedridden three to four days immediately following the incident. For the first few days following the incident, Andy was very shaky and could not walk without assistance. In the months following the incident, he had an extreme tremor in both hands, experienced blurriness and dizziness, and suffered from severe headaches every four to six weeks.
Dr. Susan Andrews, Andy's treating psychologist, testified that the CT scan taken on the day of the incident revealed Andy had sustained a cerebral concussion on the upper left frontal lobe. She first saw Andy as a patient on September 22, 1993. At that time Andy complained of headaches, nightmares, blurred vision, dizziness, and panic attacks. These complaints continued for several months following the incident.
On December 2, 1993, Dr. Andrews performed a neuropsychological evaluation. Her diagnosis revealed Andy was suffering from post-traumatic stress disorder, *1235 which was a direct result of the September 17 beating. Based on the tests administered by Dr. Andrews, Andy was experiencing problems with his memory and concentration. The residual deficits Andy displayed in December 1993 included some permanent left frontal lobe deficits such as conceptual problem solving, problems with organizing his thoughts verbally, and a problem with his right hand motor speed. In addition to these problems, Dr. Andrews also found some problems indicative of an injury to the right parietal area, which were manifested when Andy was asked to perform internal visualization exercises.
By December 1993, Andy's nightmares had decreased. However, Dr. Andrews still requested that Andy be allowed to transfer to a different school because of the problems he experienced stemming from the September 17 incident. As a result, Andy's homebound instruction was conducted through Mandeville High School. Due to the effects of his injuries, Andy spent the remainder of the 1993-94 school year receiving homebound instruction. Dr. Andrews continued to treat Andy until March of 1994.
Following the school year, Andy and his family moved to South Carolina, because his stepfather accepted a job transfer. Dr. Andrews did not see Andy again until September 30, 1995. Andy was reevaluated on this date and Dr. Andrews found that Andy still experienced the hand tremors; however, his memory, visual processing, and auditory processing had improved. Also, Andy's post-traumatic stress disorder had resolved at this point.
The trial court awarded Andy $75,000.00 in general damages. Before a court of appeal can disturb an award of general damages made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making the award. Only after making the determination that the lower court abused its much discretion can the appellate court disturb the award and then only to the extent of lowering (or raising) to the highest (or lowest) point which is reasonably within the discretion afforded the court. Only after such determination of abuse has been reached is a resort to prior awards appropriate for purposes of then determining what would be an appropriate award for the present case. Bell, 731 So.2d at 902.
Considering the injuries to Andy produced post-traumatic stress disorder, that Andy had many problems with memory and concentration, and that he still experienced some of these problems at the time of trial, we do not find the trial court's award of $75,000.00 to be an abuse of discretion. Accordingly, that portion of the award will not be disturbed.
The claim for loss of consortium is broken down into several components including loss of love and affection, society and companionship, sexual relations, the right of performance of material services, right of support, aid and assistance, and felicity. Proof of any of these elements is sufficient for an award of consortium. Odom v. Claiborne Electric Cooperative, Inc., 623 So.2d 217, 226 (La.App. 2nd Cir.), writ denied, 629 So.2d 1171 (La.1993).
In the present case, Frazer testified that she assisted Andy in getting up and moving around the week following the accident. She also described that after the incident, when Andy was given multiple chores, the tasks would have to be repeated because of his trouble remembering what he had been told. However, there is no evidence in the record of how Andy's injuries affected their relationship and the effect of his injuries on his mother. Based on our review of the record, we find the award of $5,000.00 was an abuse of discretion. An examination of the jurisprudence reveals that the highest amount the award can be lowered to is $2,500.00. See Brungart v. K-Mart Corporation, 95-0708 (La.App. 1st Cir.2/23/96), 668 So.2d 1335, writ denied, 96-0763 (La.5/3/96), 672 So.2d 686. Accordingly, we reduce the loss of *1236 consortium award to Denise Frazer to $2,500.00.
In cases in which the plaintiff has been assigned a percentage of fault, the "recoverable damages" are the total award, reduced by the plaintiff's percentage of fault. LSA-C.C. art. 2323;[5]see Ehrman v. Holiday Inns, Inc., 94-0312, p. 16 (La.App. 4th Cir.3/29/95), 653 So.2d 732, 741, writs denied, 95-1051, 95-1058 (La.6/16/95), 655 So.2d 342. The fault assessment of 5% attributable to Andy Cundiff, when subtracted from the total award of $75,000.00, operates to make the amount of his recoverable general damages $71,250.00.
At the time of this incident, LSA-C.C. art. 2324(B) provided, in pertinent part, as follows:
If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of the Article, all parties shall enjoy their respective rights of indemnity and contribution. (Emphasis ours.)
In 1996, LSA-C.C. art. 2324 was amended to eliminate all solidarity except for intentional tortfeasors. The elimination of solidary liability for negligent tortfeasors altered the existing rule and changed the liability for damages that could be recovered. Such a substantive change can only be applied prospectively; therefore the applicable version of Article 2324 was the one that existed at the time of this incident. See Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, p. 9 (La.4/24/98), 712 So.2d 62, 67.
Applying LSA-C.C. art. 2324 as it existed at the time of this incident, the School Board is solidarily liable to the extent necessary for Andy Cundiff to recover 50% of his recoverable damages ($71,250.00).[6] In Touchard v. Williams, 617 So.2d 885, 892 (La.1993), the supreme court interpreted this same version of LSA-C.C. art. 2324(B) to mean that, except for tortfeasors whose liability is greater than 50%, each negligent tortfeasor is solidarily liable for up to 50% of the plaintiff's recoverable damages. Accordingly, the School Board's liability is raised from 20% to 50%.
We have also considered whether the recent case of Farbe v. Casualty Reciprocal Exchange, 00-0076 (La.7/6/00), 765 So.2d 994, would allow the School Board to receive a credit for the fault assigned to the dismissed intentional tortfeasors. In Farbe, the supreme court allowed a defendant, DOTD, which had been assessed 20% fault, to receive a credit for the 80% fault assigned to another tortfeasor (Beaver) who had settled with the plaintiff prior to trial. Instead of finding DOTD to be 50% liable because of the solidarity provision of the pre-1996 version of LSA-C.C. art. 2324, the supreme court found DOTD would only be responsible for its 20% fault *1237 assessment. The court reasoned that the plaintiff's settlement with Beaver deprived DOTD of the right to enforce contribution against the released tortfeasor.
However, we do not find the School Board is entitled to such a credit, because the intentional tortfeasors were not released, but were dismissed without prejudice by Andy Cundiff. A dismissal without prejudice does not have the same effect as a release, since the School Board has not been deprived of its right to seek contribution against the intentional tortfeasors. Therefore the School Board is solidarily liable for up to 50% of Andy Cundiff's recoverable damages.

CONCLUSION
Based on the foregoing reasons, the judgment of the trial court assessing 100% fault to the School Board is vacated and fault is assessed as follows: 20% to School Board, 25% to Eric Costello, 25% to Joe Julian, 25% to Josh Julian, and 5% to Andy Cundiff. We also affirm the award of general damages of $75,000.00 to Andy, but reduce the loss of consortium award to his mother to $2,500.00. However, by operation of LSA-C.C. art. 2324, the School Board is liable for 50% of the recoverable damages awarded. Accordingly, we find the St. Tammany Parish School Board is responsible for paying general damages of $35,625.00, plus legal interest, to Andy Cundiff, and for paying $3,029.18 in medical expenses and $1,250.00, plus legal interest, to Denise Frazer for her loss of consortium. In all other respects, the judgment is affirmed. Costs of this appeal in the amount of $538.00 are assessed to the St. Tammany Parish School Board.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] Honorable H. Ward Fontenot, 38th Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The principal of Northshore High School.
[3] An assistant principal of Northshore High School.
[4] An assistant principal of Northshore High School.
[5] The applicable language of LSA-C.C. art. 2323 provides, in pertinent part:

If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
[6] One hundred percent solidarity is still applicable to the intentional tortfeasors, Eric Costello, Joe Julian, and Josh Julian. See LSA-C.C. art. 2324(A). We do not agree with the holding regarding the award of damages in Pinsonneault v. Merchants & Farmers Bank & Trust Co., 99-12 (La.App. 3rd Cir.7/21/99), 738 So.2d 172, writ granted, 99-2681 (La.2/4/00), 753 So.2d 842, and decline to follow it.