LARRY VOYD THOMAS and LINDA NEWCOMER THOMAS
v.
GLEN SHERIDAN, AUBREY JONES AND THE PARISH OF WASHINGTON
No. 2007 CA 1291.
Court of Appeals of Louisiana, First Circuit.
February 8, 2008.
JOHN F. WEEKS, II, LLOYD FRED SCHROEDER, II, TIMOTHY R. RICHARDSON New Orleans, LA, Attorney for Defendant/Appellant Washington Parish Sheriff AUBREY JONES.
ANNE E. TATE DAVID A. CHEATHAM Bogalusa, LA, Attorneys for Plaintiffs/Appellees. LARRY VOYD THOMAS and LINDA Newcomer Thomas.
CHARLES C. FOTI, JOHN G. MORGAN, Baton Rouge, LA, Attorneys for Intervenor/Appellee The State of Louisiana, Office of the Governor, Division of Administration, Office of Risk Management.
Before: CARTER, C.J., PETTIGREW and WELCH, JJ.
CARTER, C.J.
Washington Parish Sheriff Aubrey Jones appeals a judgment finding him completely at fault and awarding damages to a nurse who was held hostage by an inmate in the custody of the Washington Parish Sheriffs Office ("the Sheriff's Office").

FACTS AND PROCEDURAL HISTORY
This suit arises from a hostage situation that occurred on February 15, 2003, in the intensive care unit (ICU) of the LSU Bogalusa Medical Center. Oscar Penton, who had recently been arrested and was in the custody of the Sheriff's Office, had been admitted to the ICU for symptoms of OxyContin withdrawal. Penton was guarded by an armed Sheriff's Office deputy, Glen Sheridan. Penton's legs were shackled and his hands handcuffed and secured to a waist chain until his left hand was freed so that he could eat. Deputy Sheridan did not handcuff Penton's left hand after he ate. Further, Penton was not shackled to the hospital bed. When Deputy Sheridan approached Penton's bed, Penton reached over and removed Deputy Sheridan's gun from its holster. Deputy Sheridan ran from the ICU and alerted authorities.
On that date, the plaintiff, Larry Thomas, a fifty-two-year-old registered nurse employed by the hospital, was attending to patients in the ICU. The ICU is a large room with patient cubicles arranged in a horseshoe shape around the room's perimeter, and a nurses' station in the center. Thomas testified that he heard Deputy Sheridan run from the ICU yelling that the prisoner had his gun, and stepped outside of the cubicle in which he had been working. Thomas saw Penton standing outside of another cubicle holding the gun. According to Thomas, Penton waved the gun at Thomas and another nurse, Susan Smith, who was also working in the ICU, and told them to walk toward him. As Smith began walking toward Penton, Thomas stepped back into the cubicle behind him and hid.
A Deputy Sheriff working at the hospital as a security guard soon entered the ICU and began negotiating with Penton. Penton fired the gun into the air, leading Thomas to fear that Penton had killed Smith; however Thomas assumed Smith was safe when he heard Penton state it was a warning shot. Penton demanded drugs, then cigarettes. The Deputy Sheriff countered that Penton would have to release a hostage in exchange. When Penton agreed, the Deputy Sheriff pointed at Thomas and told him to leave. Thomas left the ICU approximately ten minutes after the hostage situation began. The situation ended when the Deputy Sheriff and reinforcements overpowered Penton. No hostages were physically injured.
Thomas' next work shift was scheduled for four days after the incident. Thomas returned to work, which he described as "a day from hell," and "lost it" toward the end of the day. Two weeks later, Thomas attempted to return to his job, but experienced trouble in that he was irritable, felt like crying and was easily angered. Thomas tried again to return to work at a later date, but was unable to complete more than one hour of his shift. Since that time he has not worked in any capacity.
After his first attempt to return to work, Thomas met with the hospital social worker, who referred him to Cindy McNitt, a licensed clinical social worker. Thomas began treating with McNitt and on her recommendation, also sought psychiatric treatment. Thomas was diagnosed with post traumatic stress disorder (PTSD) and began taking several medications to control the disorder's symptoms. At the time of trial, Thomas was still seeing McNitt, taking the prescribed medications, and had recently begun seeing a new psychiatrist.
Thomas and his wife initiated this suit for damages against Deputy Sheridan, Sheriff Jones, and the Parish of Washington, seeking general damages, as well as medical expenses and lost wages. Thomas' wife claimed loss of consortium damages. Thomas alleged, among other things, that Deputy Sheridan did not properly guard Penton, and also that Sheriff Jones failed to properly train Deputy Sheridan, and failed to implement adequate safety measures. Penton was not named as a defendant. The defendants answered pleading affirmative defenses including plaintiffs' failure to mitigate damages and comparative fault.
After a bench trial, the trial court took the matter under advisement, and then issued written reasons for judgment stating:
This Court finds no fault on the part of the plaintiffs, and instead finds that the Washington Parish Sheriffs Office is 100% at fault . . . Although it is uncertain if Deputy Sheridan and Sheriff Jones were named defendants individually, these two workers for the Parish are not individually liable for any damages. The total liability, therefore, falls upon the Sheriff's Office of the Parish of Washington.
A judgment was subsequently rendered against Sheriff Jones awarding damages as follows: $240,265.54 for past lost wages; $206,400.00 for future lost wages; $41,529.34 for past medical expenses; $10,600.00 for future therapy; $650,000.00 in general damages. The trial court further awarded Thomas' wife, Linda Newcomer Thomas, $250,000.00 for loss of consortium. It is explained on appeal that the judgment was rendered against Sheriff Jones by agreement of the parties as the Washington Parish Sheriff's Office is not a legal entity with capacity to be sued. Sheriff Jones now appeals.

DISCUSSION

Comparative Fault
The trial court assigned the Sheriff 100% fault in causing Thomas' injuries. The trial court's reasons reflect that it considered whether Thomas and his wife should be assessed any degree of contributory fault. However, the trial court did not consider the fault of Penton, who all parties agree was the intentional tortfeasor.[1]
In 1996, the legislature revised Louisiana's comparative fault law and amended LSA-C.C. art. 2323 to provide that "[i]n any action for damages . . ., the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty . . .The [foregoing] provisions . . . shall apply to any claim for recovery of damages . . . asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability." Thus, Article 2323 clearly requires that the fault of every person responsible for a plaintiff's injuries be compared regardless of the legal theory of liability asserted against each person. Landry v. Bellanger, 02-1443 (La. 5/20/03), 851 So.2d 943, 952.
Prior to the 1996 amendment, in the case of Veazey v. Elmwood Plantation Associates Ltd., 93-2818 (La. 11/30/94), 650 So.2d 712, 719, the Louisiana Supreme Court concluded that under the existing law, fault of an intentional and a negligent tortfeasor could be compared, but the question of whether such fault should be compared was a determination for the trial court to be made on a case-by-case basis, taking into account public policy considerations. Since the 1996 amendment, this court has recognized that "[t]he discretion once afforded trial courts in comparing the fault of fewer than all persons responsible for an injury, whether they were a party to the action or whether their identity was known, has been eliminated." Frazer v. St. Tammany Parish School Board, 99-2017 (La. App. 1 Cir. 12/22/00), 774 So.2d 1227, 1231, writ denied, 01-0233 (La. 3/23/01), 787 So.2d 1001. Thus, under the current law, the fault of the intentional tortfeasor should be quantified along with the fault of negligent parties. Louviere v. Louviere, 01-0089 (La. App. 1 Cir. 6/5/02), 839 So.2d 57, 70, writs denied, 02-1877 (La. 10/25/02), 827 So.2d 1150; 02-1878 (La. 10/25/02), 827 So.2d 1151; 02-1879 (La. 10/25/02), 827 So.2d 1151; 02-1848 (La. 10/25/02), 827 So.2d 1152; 02-1868 (La. 10/25/02), 827 So.2d 1152.
Plaintiffs argue that this case presents a situation in which the negligent defendant (the Sheriff) had the duty to prevent the intentional conduct of the other tortfeasor (Penton). Plaintiffs contend this situation falls within a narrow exception to the general rule that the fault of the intentional tortfeasor should be quantified along with the fault of the negligent tortfeasor. However, the clear and unambiguous language of Article 2323 contains no exception such as that suggested by plaintiffs. Accordingly, Article 2323 shall be applied as written. Cf. Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc., 06-0582 (La. 11/29/06), 943 So.2d 1037, 1045. Article 2323, as amended in 1996, now requires that the fault of every person responsible for a plaintiffs injuries be compared regardless of the legal theory of liability asserted against each person. Landry, 851 So.2d at 952. Courts no longer have the discretion to compare the fault of fewer than all persons responsible for an injury. Frazer, 774 So.2d at 12.31.
The trial court erred in failing to consider and quantify Penton's fault. Where the trial court commits legal error by applying the incorrect legal standard or principle, this court is required to determine the facts de novo from the entire record and render a decision on the merits. Louviere, 839 So.2d at 72.

Actions of the Sheriff
Sheriff Jones hired Deputy Sheridan, a sixty-two-year-old retiree with no law enforcement experience, as a part-time reserve deputy in August or September of 2002, a few months prior to the incident. Deputy Sheridan completed a POST certification course, which included instruction on gun safety and retention. It is undisputed that the Sheriff's Office offered Deputy Sheridan no formal training in the handling of prisoners, and no instruction on how to approach a prisoner while armed. Deputy Sheridan was never informed that he should check to see if a prisoner in the hospital was shackled to the bed frame.[2] Deputy Sheridan testified that the only information he received about his duties came from asking questions. Prior to guarding Penton, Deputy Sheridan guarded one prisoner at a Covington hospital.
Deputy Sheridan testified that on the date of the incident, he was informed that Penton was hospitalized for symptoms of OxyContin withdrawal, but was not told that Penton was a flight risk, having escaped from police custody while in a different hospital two days earlier. Deputy Sheridan explained that he left Penton's left hand free, rather than handcuffing it after Penton ate, at Penton's request and because he "was trying to be human about it." Penton gained control of the gun when Deputy Sheridan approached Penton's bed to speak with Penton about a request Penton made to use a telephone.[3]
Sheriff Jones testified that he did not know if Deputy Sheridan was given the previous Sheriffs policy on guarding prisoners in the hospital. He further explained that although an incident occurred less than a month after he took office in which a prisoner disarmed a guard in another hospital, he instituted no additional training for his deputies.
Custodians of prisoners have a duty to manage the activities of their respective prisons in a manner such that the public is not exposed to an unreasonable risk of harm. The State is not the insurer of the safety of its citizens; therefore this duty does not encompass all harm inflicted by an escapee. However, the operative intent of this duty is to protect the public from being harmed by escaping prisoners while in the process of their escape. In order to recover for injuries caused by an escaped prisoner, an injured plaintiff must prove: 1) negligence on the part of the custodian in managing the facility; 2) that this negligence facilitated the escape; 3) that the escapee's actions caused the harm complained of; and 4) that the risk of harm encountered by the plaintiff falls within the scope of duty owed by the custodian. Marceaux v. Gibbs, 96-2839 (La. 9/9/97), 699 So.2d 1065, 1069; Edwards v. State, 556 So.2d 644, 649 (La. App. 2 Cir. 1990). The scope of duty is generally determined by questioning whether the offense occurred during or as an integral part of the escape. Marceaux, 699 So.2d at 1070.
Penton was guarded by an untrained deputy whose actions facilitated the complained of hostage incident. It is unquestioned that Thomas' PTSD diagnosis is causally linked to the hostage incident. Further, the risk of harm clearly falls within the Sheriff's duty of managing the inmate in its custody without exposing the public to an unreasonable risk of harm. Finally, there is no question that the hostage incident occurred as an integral part of Penton's "escape." Sheriff Jones' negligence in managing Penton's custodial arrangements constituted a breach of his duty of care.

Actions of Penton
At the time of the incident, Penton was suffering symptoms of withdrawals after taking twenty four milligrams of OxyContin two days earlier. Penton testified that he has some memories of the incident, but that some of it was surreal. He stated that he remembers being in the hospital with his left hand free. He testified he remembers "just not feeling right," Deputy Sheridan bending over next to him, and then grabbing the gun. Penton testified he wanted drugs and fired the warning shot in an effort to intimidate the deputy with whom he negotiated. Penton testified that he has no memory of Thomas being in the ICU. Penton acknowledged, however, that "anybody in the immediate area would have felt threatened while I was waving around a 38 police special."
The deputy who negotiated with Penton testified that Penton was "wildeyed" and "unpredictable." All accounts are consistent that Penton demanded drugs and did not attempt to leave the hospital.

Fault Apportionment
In apportioning fault among the tortfeasors, we are guided by the following factors:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La. 1985).
After carefully reviewing the entire record and considering the Watson factors, we find that 50% fault should be assigned to Penton. Penton acted of his own will in disarming the deputy, holding the entire ICU hostage, and threatening the hostages by firing the deputy's gun. Sheriff Jones bears the remaining 50% fault. Therefore, the Sheriff is 50% liable to plaintiffs. See LSA-C.C. art. 2324.

General Damages
The trial court awarded Thomas $650,000.00 in general damages and Thomas' wife $250,000.00, for her loss of consortium. Sheriff Jones contends these amounts are excessively high.
A trial court's assessment of the appropriate amount of damages, including those awarded for loss of consortium, is a question of fact entitled to great deference on review. LSA-C.C. art. 2324.1; Jones v. Harris, 04-0965 (La. App. 4 Cir. 2/2/05), 896 So.2d 237, 250 (recognizing that damages awarded for loss of consortium are a type of general damages and therefore the trier of fact has much discretion in making such an award). The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific. Furthermore, the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 508 U.S. 910, 113 S.Ct. 2342, 124 L.Ed.2d 252 (1993). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse as to the fact finder's much discretion. Terrance v. Dow Chemical Co., 06-2234 (La. App. 1 Cir. 9/14/07), ___ So.2d ___, __, writ denied, 07-2042 (La. 12/14/07), ___ So.2d ___.
The record shows that Thomas remained in the ICU with Penton for several minutes,[4] before being told to leave by the deputy with whom Penton negotiated. During that time, Thomas witnessed Penton holding the gun and heard a shot fired. After the incident, Thomas suffered from PTSD, for which he was still being treated at the time of trial. The PTSD affected Thomas' personal life, as recognized in the following excerpt from the trial court's written reasons:
[Thomas'] life has changed dramatically. He used to hunt, fish, boat, attend festivals and movies, and enjoy dinner at restaurants. Now his physical activities are restricted to mowing the lawn and watching television. He is on several medications, including his usual diabetic ones, and has gained thirty pounds. He has trouble talking to people or being around groups, even old friends. He finds he cannot bear to enter the nursing home to visit his own mother, for the setting reminds him of the event, and his sex life has vanished. Although he has taken a few long trips, he is fearful, carries a gun with him at all times, and sits with his back to the wall when possible. His favorite extra activity is attending religious retreats in which little is spoken and all participate in household chores. His demeanor in court was extremely flat and emotionless.
The record clearly supports an award of general damages. However, even giving deference to the trial court's vast discretion in setting general damages, we must conclude that the trial court abused its discretion in awarding Thomas $650,000.00 in general damages and Thomas' wife $250,000.00 for her loss of consortium. The awards are simply beyond that which a reasonable trier of fact could assess based upon this record.
After an appellate court determines that the trial court abused its discretion in awarding general damages, it is appropriate for the appellate court to consider prior awards for the purpose of determining the highest or lowest point which is reasonably within that discretion. See Youn, 623 So.2d at 1260-61. It is never appropriate for an appellate court, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1977). The appellate court is limited to lowering the excessive general damages award to the highest amount reasonably within the trial court's discretion. See Coco, 341 So.2d at 335.
Considering the particular facts and circumstances of this case, the trial court's factual findings, and the general damages awards for similar injuries, and also those involving injuries caused by prisoners escaping custody, we find that the highest amount for Thomas' general damages that was reasonably within the trial court's discretion was $325,000.00.
Thomas' wife's claim is one for loss of consortium. The claim for loss of consortium is broken down into several components including loss of love and affection, society and companionship, sexual relations, the right of performance of material services, right of support, aid and assistance, and felicity. Proof of any of these elements is sufficient for an award of consortium. Frazer, 774 So.2d at 1235. The record contains proof that following the incident, Thomas became withdrawn and irritable, resulting in his wife suffering a loss of love, affection, society, and companionship.
The record also contains proof of a decrease of sexual relations, as well as a decrease in aid and assistance. Ms. Thomas testified that essentially her husband shut down and she was afraid to leave his side for fear of what he might do to himself. Ms. Thomas ultimately sought professional treatment from McNitt, which was ongoing at the time of trial. Ms. Thomas also began taking prescription medication to deal with the added stress.
Based on the record, an award for loss of consortium was clearly warranted. However, we find that the trial court's award of $250,000.00 exceeded that which a reasonable trier of fact could have awarded based on the record. As previously set forth, a reviewing court that determines a trial court abused its discretion in setting damages is limited to lowering the excessive award to the highest amount reasonably within the trial court's discretion. See Coco, 341 So.2d at 335. Based on the record before us, we conclude that the highest amount reasonably within the trial court's discretion was $75,000.00.
Considering the foregoing and this court's assessment of 50% fault to Penton, we amend the monetary awards in the trial court's judgment to reflect the Sheriff's liability for 50% of the damage awards. See LSA-C.C. art. 2324. Thus, the Sheriff is liable to Thomas for $162,500.00 in general damages and to Thomas' wife for $37,500.00 for her loss of consortium. These amounts do not violate the $500,000.00 statutory cap on damages established by LSA-R.S. 13:5106.

Lost Wages
The trial court awarded Thomas $240,265.54 for past lost wages and $206,400.00 for future lost wages. Sheriff Jones contends that these awards are speculative and also that Thomas failed to mitigate his damages in that he has refused to apply for any sort of employment.
A trial court's award of lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty. Boudreaux v. State, Dept. of Transp. and Development, 04-0985 (La. App. 1 Cir. 6/10/05), 906 So.2d 695, 705, writs denied, 05-2164 (La. 2/10/06), 924 So.2d 174, and 05-2242 (La. 2/17/06), 924 So.2d 1018. The record herein contains expert medical testimony, some of which is conflicting as to whether Thomas is able to return to employment. Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error. Hanks v. Entergy Corp., 06-477 (La. 12/18/06), 944 So.2d 564, 581.
After considering the entire record, we cannot say that the trial court committed manifest error in accepting the expert opinion that Thomas is not able to return to employment. Thus, we find no manifest error in the trial court's finding that Thomas did not fail to mitigate his damages by refusing to seek employment. Further, the damages for past and future lost wages are reasonably supported by the record. Accordingly, we affirm the awards for lost wages.

CONCLUSION
Considering the foregoing, the judgment of the trial court is modified insofar as it failed to allocate fault to Oscar Penton. The judgment of the trial court is amended in its amount to reduce the general damages awarded to Thomas and his wife, Linda, and also to reflect the fault assessed to Penton and the resulting reduced fault of Sheriff Aubrey Jones as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Larry Voyd Thomas and against defendant, Aubrey Jones, in his official capacity as Sheriff of Washington Parish, for the following damages:
1. $120,132.77 (one hundred twenty thousand one hundred thirty two and 77/100 dollars) for loss of past wages;
2. $103,200.00 (one hundred three thousand two hundred and 00/100 dollars) for loss of future earnings;
3. $20,764.67 (twenty thousand seven hundred sixty four and 67/100 dollars) for past medical expenses paid through October 23, 2006;
4. $5,300.00 (five thousand three hundred and 00/100 dollars) for future therapy;
5. $162,500.00 (one hundred sixty two thousand five hundred and 00/100 dollars) in general damages
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Linda Newcomer Thomas and against defendant, Aubrey Jones, in his official capacity as Sheriff of Washington Parish, for damages for loss of consortium in the amount of $37,500.00 (thirty seven thousand five hundred and 00/100 dollars).
One half of the costs of this appeal, which amounts to $3,765.13 (three thousand seven hundred sixty five and 13/100 dollars) are assessed to Sheriff Aubrey Jones. The remainder of the costs of appeal is assessed to plaintiffs Larry Voyd Thomas and Linda Newcomer Thomas.
JUDGMENT AMENDED AND AFFIRMED.
NOTES
[1] Plaintiffs advance the argument that the trial court's assessment of 100% fault to the Sheriff is a de facto finding of 0% fault on the part of Penton. However, the trial court's reasons show no consideration of Penton's fault and do not support plaintiffs' position.
[2] The record contains some question as to whether it is generally appropriate procedure to shackle a prisoner to a bed frame.
[3] There is some dispute as to how close Deputy Sheridan was to Penton when Penton reached for the gun. Estimations ranged from Deputy Sheridan standing at the foot of Penton's bed, to Deputy Sheridan reaching across Penton's body.
[4] The exact time that Thomas was in the ICU with Penton after Penton gained control of Deputy Sheridan's gun is unknown. However, the record establishes that the second deputy arrived in the ICU minutes after Deputy Sheridan left and warned others that Penton had the gun. The record further establishes that Thomas was released approximately ten minutes after the second deputy arrived.