# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


## 22-1


**SHARON TISDALE**


**VERSUS**


**DAVID HEDRICK AS SHERIFF OF CONCORDIA PARISH
AND MATTHEW MORGAN**


**\*\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, DOCKET NO. 52698
HONORABLE JIMMIE C. PETERS, DISTRICT JUDGE AD HOC


**\*\*\*\*\*\*\*\*\*\*\***
**SYLVIA R. COOKS**
**CHIEF JUDGE**
**\*\*\*\*\*\*\*\*\*\*\***


Court composed of Sylvia R. Cooks, Chief Judge, Jonathan W. Perry and Sharon Darville Wilson, Judges.


**AFFIRMED.**


**Charles S. Norris**
**Christopher Norris**
**P.O. Box 400**
**Vidalia, LA 71373**
**(318) 336-1999**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
        **Sharon Tisdale**

**Vincent J. Desalvo**
**7918 Wrenwood Blvd., Suite A**
**Baton Rouge, LA 70809**
**(225) 927-7035**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
        **Sharon Tisdale**

**Ronald S. Bryant**
**Timothy R. Ruchardson**
**Frosch, Rodrigue, Arcuri, LLC**
**1615 Poydras Street, Suite 1250**
**New Orleans, LA 70112**
**(504) 592-4600**
**COUNSEL FOR DEFENDANT/APPELLEE:**
        **David Hedrick, Concordia Parish Sheriff**

**COOKS, Chief Judge.**

On February 20, 2019, Plaintiff, Sharon Tisdale, after purchasing groceries at a Wal-Mart store in Vidalia, Louisiana, was walking to her vehicle in the parking lot. Defendant, Matthew Morgan, approached her and offered to assist her in loading her groceries into her vehicle. Plaintiff, who stated she was uncomfortable with the way Mr. Morgan approached her, initially refused the offer of assistance. However, Mr. Morgan continued to insist that he help her, and she relented and allowed him to help her.

After the groceries were loaded, Plaintiff closed her rear storage compartment and went to sit down in the driver's seat, when Mr. Morgan suddenly jerked the driver's side door open and told Plaintiff "I need a ride, and I need it right now." Plaintiff attempted to reason with him and even offered him money to leave her alone. Mr. Morgan declined the offer of money saying "I will need the money later, but right now I need a ride." According to Plaintiff, Mr. Morgan became extremely agitated and began cursing her. He demanded she move over into the passenger seat so that he could get behind the wheel. Plaintiff refused, telling Mr. Morgan she could not maneuver over the front seat console.

Mr. Morgan then pulled Plaintiff from the driver's seat, closed the door and produced what Plaintiff described as a box cutter. He then began to walk her over to the other side of the vehicle to place her in the passenger seat. Plaintiff realized that her assailant was intent upon taking her with him, rather than just taking the vehicle. Mr. Morgan placed her in the passenger seat, closed the door and began walking around the vehicle to get to the driver's side door. Fearing what would happen to her if she went with Mr. Morgan, Plaintiff opened the door, jumped out and ran away from the vehicle screaming. Mr. Morgan then ran from the vehicle toward a bank building between the Wal-Mart parking lot and the highway. Not

long afterwards, police quickly arrived on the scene and apprehended Mr. Morgan inside the bank.

Mr. Morgan was a twice convicted felon who was an inmate trustee in the custody of the Sheriff of Concordia Parish, David Hedrick. Mr. Morgan's first felony conviction in 2002 was for forcible rape, the offense occurring on September 24, 1996 in Alexandria, Louisiana.[1] Upon his release from that conviction, Mr. Morgan was convicted of possession of a firearm by a convicted felon. He was eventually assigned to the Concordia Parish Correctional Facility (hereafter CPCF), located in Ferriday, Louisiana. Sheriff Hedrick, as Concordia Parish's elected sheriff, was in charge of the operation of the CPCF and the Concordia Parish jail.

At some point after arriving at the CPCF, Mr. Morgan applied for a trustee position, which was approved by Warden Lance Moore. Mr. Morgan was transferred to the parish jail, which is located in the Concordia Parish Courthouse, just outside of Vidalia and within walking distance of the Wal-Mart.

On the morning of February 20, 2019, Mr. Morgan was assigned to work with other trustees on the Courthouse grounds. The group of trustees was under the supervision of Concordia Parish Deputy Sheriff Morris Wilson. At some point, Deputy Wilson left the courthouse to run some errands. He testified he believed this was okay because there was a social function being conducted at the Courthouse and other deputies would be present to supervise the inmates. The trial court noted the record established no other deputies were aware they were expected to supervise the inmates. Noticing the lack of supervision, Mr. Morgan, who was dressed in blue jeans and a black jacket, simply walked away from the Courthouse and made the walk to the Vidalia Wal-Mart where he attempted to kidnap Plaintiff.

---

[1] Mr. Morgan was initially charged with aggravated rape, but he and the State entered into a plea bargain where he agreed to plead guilty to forcible rape. He was sentenced to serve thirty years at hard labor with twenty years of the sentence to be served without the benefit of probation, parole, or suspension of sentence. Mr. Morgan was given credit for time served and was subsequently granted parole.

As a result of the incident. Plaintiff suffered only minor physical injuries. However, she sustained significant emotional trauma from the incident. She initially saw Dr. Huey Moak, a general practitioner, a few days after the incident. She complained of being very nervous and an inability to sleep. He prescribed her with anxiety medication (Xanax).

She next saw Joe Swoveland, a licensed professional counselor, on March 11, 2019. She treated with Dr. Swoveland on several occasions and he found her to be suffering from anxiety and depression. Mr. Swoveland testified Plaintiff was restless, unable to sit still and had an exaggerated startle response. She also complained of chest pain, abdominal distress, increased heart rate and obsessive thoughts. She complained to Mr. Swoveland that she had been affected by the incident to such a degree she could not even attend her church. By her third visit to Mr. Swoveland, Plaintiff said she began experiencing frequent nightmares. She told Mr. Swoveland she began sleeping with a weapon on her bedside table when her husband was not at home. Her husband worked in the oil and gas industry and was frequently offshore for upwards of a week or more at a time. Mr. Swoveland, who could not prescribe medication, believed the Xanax Plaintiff was taking was not of a sufficient dosage to alleviate her anxiety. Mr. Swoveland also noted that the relationship between Plaintiff and her husband suffered significantly, as Plaintiff felt her husband was not sufficiently supportive and was becoming frustrated that she was not getting better. Mr. Swoveland did note that by her April 11, 2019 visit Plaintiff had, for the first time since the incident, gone by herself to a local store to buy goods. She stated she experienced some anxiety, but was able to cope by using cognitive techniques she learned at therapy. She also went on a shopping trip with female friends, but experienced significant panic when a male employee of one of the stores helped load some plants in her vehicle. Mr. Swoveland was adamant in his diagnosis that Plaintiff suffered from post-traumatic stress disorder (PTSD). Mr.

Swoveland stated it was his goal in treating Plaintiff, to make enough progress through therapy to decrease her symptoms to a point that she would no longer meet the PTSD criteria. He did believe she had made some, limited progress, but was unsure if she would ever recover.

Plaintiff began treating with Dr. Warren Lowe, a medical psychologist. Dr. Lowe immediately diagnosed that Plaintiff suffered from PTSD, which he categorized as severe in nature. He noted prior to the incident Plaintiff had no psychological problems but following the attack by Mr. Morgan she had "hypervigilance, startle reactions, a very significant amount of anxiety, much difficulty being out, and even in the company of others, but certainly at that time not even going out alone." Dr. Lowe continued Plaintiff on Xanax and also started her on Lexapro, an antidepressant medication. Dr. Lowe felt Plaintiff was "trying very hard" to cope with her situation but was having difficulty making much progress. There was a break in Plaintiff's office visits with Dr. Lowe's due to the Coronavirus pandemic. When he saw her after an approximate one-year period, Plaintiff stated her PTSD symptoms still occurred, but were not as frequent. She did acknowledge she would not answer her door unless she knew who was ringing the doorbell and she was still suffering frequent flashbacks. Dr. Lowe found the Lexapro had caused Plaintiff to gain significant weight since the last visit. He reluctantly agreed to put her on a lesser dosage for the benefit of her self-esteem. Dr. Lowe last saw Plaintiff on November 16, 2020. Plaintiff agreed she would continue to see Dr. Patricia Brawley, a McComb, Mississippi licensed professional counselor and mental health therapist. Dr. Lowe concluded after his numerous treatments with Plaintiff that she would, "more likely than not, require psychological treatment including medication for an indefinite period of time. At a minimum, I would estimate this treatment will be necessary for at least the next five to ten years, but perhaps much longer."

5

Not long after beginning treatment with Dr. Lowe, Plaintiff also began seeing Dr. Brawley. Her first visit with Dr. Brawley was in September of 2019. Plaintiff related she had difficulty sleeping, was easily frightened and cried constantly. Dr. Brawley agreed with the other healthcare professionals that Plaintiff suffered from PTSD as a result of the incident with Mr. Morgan. On her second visit with Dr. Brawley, Plaintiff described an incident where she was unable to answer her door for a repairman she knew was coming, but instead hid in the bathroom until he left. She explained to Dr. Brawley she had extreme difficulty in eating at restaurants and doing many simple things, such as filling her vehicle with gas. Despite the social distancing requirements implemented during the pandemic, Plaintiff still could not stand in a line of people, even six feet apart. Plaintiff explained to Dr. Brawley that on the rare instances she went shopping, if she was required to stand in line with other people, she would simply leave the store when panic was beginning to set in. As with Dr. Lowe, the pandemic limited the face-to-face sessions with Dr. Brawley, but videoconferencing and telephonic sessions were conducted. In her deposition, Dr. Brawley felt Plaintiff learned some coping skills, but "still [has] a ways to go" and the negative triggers she experiences from the incident will always remain as a part of her life.

As a result of the traumatic event inflicted upon her by Mr. Morgan, on January 27, 2020, Plaintiff filed a petition seeking to recover personal injury damages she sustained as a result of the incident in the Wal-Mart parking lot. Named as defendants were Sheriff Hedrick, individually and in his capacity as the Sheriff of Concordia Parish, and Mr. Morgan. Plaintiff asserted she sustained physical pain and suffering, mental anguish and emotional distress, loss of enjoyment of life, medical related expenses, and post-traumatic stress disorder (PTSD) as a result of Mr. Morgan's attack on her person. The matter proceeded to a bench trial on March 12, 2021.

As to the issue of liability, the trial court found the Sheriff's employees at the Correctional Facility were clearly negligent through their actions and inactions in allowing Mr. Morgan to acquire trustee status. The court also found Mr. Morgan was granted trustee status in large part because he had skill in air conditioner repairs. This, the trial court concluded, led to a lack of extensive vetting of Mr. Morgan as specifically required by the Policies and Procedures Manual. The trial court noted the Correctional Facility could not produce Mr. Morgan's written request nor any record stablishing a review by the department ever took place. In his deposition, Warden Lance Moore could only recall interviewing Mr. Morgan, but could not recall what was specifically discussed or what trustee status was granted. He could not even say that Mr. Morgan's trustee application had ever been reduced to writing. Combined with the Correctional Facility's failure to follow the mandates of the Policy Manual in the trustee application process, the trial court found the clear language on the Policy Manual unequivocally provided that any inmate with a "history of sex offence convictions" cannot qualify for trustee status at any level. Mr. Morgan should have been immediately eliminated from consideration of trustee status on this fact alone.

The trial court then found that the negligence of the Sheriff's employees continued when he was moved to the parish jail. The trial court noted, despite a clear policy to the contrary, Mr. Morgan was not required to wear prison clothing or clothing that identified him as an inmate. The trial court specifically found "[t]here was never a satisfactory explanation" for why this occurred. Further, Deputy Wilson left the Courthouse to obtain supplies at a nearby establishment without alerting anyone to supervise his four-man trustee unit. This left Mr. Morgan unsupervised and in civilian clothes. He simply blended into the crowd and wandered away. Thus, the trial court found Sheriff Hedrick, through the actions of his employees, was guilty of gross negligence in the attack upon Plaintiff.

The trial court also found Mr. Morgan committed an intentional tort against Plaintiff, and that fault in causing Plaintiff's damages, along with the Sheriff's fault, must be quantified pursuant to La.Civ.Code art. 2323(A). The trial court then allocated ninety percent (90%) of the fault in causing Plaintiff's damages to Sheriff Hedrick and ten percent (10%) to Mr. Morgan.

On the issue of damages, the medical records and depositions of the medical professionals who treated Plaintiff were introduced at trial. Plaintiff testified at trial and spoke of her continuing nightmares, panic attacks, inability to sleep, fear of crowds and fear of close contact with unfamiliar men. Despite the significant counseling she has received and medication she has taken, she remains in fear of things such as standing in the line at a store, pumping gas, sitting at a restaurant, hearing her doorbell ring and panicking if anyone approaches in her direction from behind. She testified her life has been significantly and detrimentally altered as a result of the incident with Mr. Morgan.

Sue Calkins, a close friend of Plaintiff, testified she has known her for over forty years and has observed the severe changes in Plaintiff since the incident. Ms. Calkins stated Plaintiff was not an overly cautious woman or a worrier, but that completely changed after February 20, 2019. Although she felt Plaintiff was trying her best, she is often simply unable to cope with her anxiety.

Plaintiff's husband also testified as to how the incident significantly changed his wife's life. He also stated it had severely impacted not just her, but the lives of her family and close friends. He stated the February 20, 2019 attack changed his wife from "fearless to fearful."

As to special damages, the trial court noted they consisted of past and future healthcare expenses and there was "little to no conflict with regard to those amounts." Plaintiff was awarded past healthcare expenses of $5,865.00 and future healthcare expenses of $10,500.00.

8

As to general damages, the trial court gave the following reasoning for awarding $250,000.00 to Plaintiff for the injuries she sustained:

> All of the healthcare providers' testimony points to one basic fact—Mrs. Tisdale will never completely recover from the effect of the injury she sustained on February 20, 2019. While all of the caregivers agree that she is a totally honest patient, is goal oriented, and has done everything within her power to cope with he recurring effects of PTSD, they also agree that her efforts will more probably than not be insufficient to affect a complete recovery. No matter how hard she may try, the "triggers" will always be there, and when she encounters the wrong one, it will have a devastating effect on her ability to cope.
>
> In most personal injury cases, we are faced with a physical injury that has emotional side effects. The results of the injury are visible to all, and always present. In Mrs. Tisdale's case, her injury is invisible to everyone else, and while it is always underlying, she never knows when a smell, sound, event, or even her imagination will trigger her uncontrollable response. While she has good and bad days, she cannot go to sleep without first wondering if she will have recurring nightmares; and she never wakes up knowing what type of day it will be. When she stops at a store, eats at a restaurant, pumps gas into her vehicle, goes to church, or even welcomes someone into her home, she cannot predict the reaction—and this is a fact she must live with for the rest of her life. While others will try their best to give support to Mrs. Tisdale's situation, they will always fail to understand her reactions to some of the most basic of human interactions. Thus, Mrs. Tisdale must face every minute practically on her own.
>
> There is no medication to prevent Mrs. Tisdale's PTSD attacks, and her learned coping skills will come to the surface, not in preparation of an attack, but only after her vulnerabilities have been exposed. This fact gives meaning to the testimony of Dr. Lowe that she must struggle to characterize her PTSD events as challenges and not absolute failures.
>
> The court has reviewed the post-trial briefs filed by the litigants, and have taken into consideration the jurisprudence submitted for review. However, a factfinder must determine the general damage award by the facts and circumstances of the case before the court, and must do so by assessing the effects of a particular injury to a particular plaintiff under the particular circumstances existing. *Youn v. Mar. Overseas Corp.*, 623 So.2d 1257 (La.1993). In this case, the court finds the appropriate general damage award to be $250,000.00.

All costs were assessed against Sheriff Hedrick. A final judgment was signed on May 3, 2021. Sheriff Hedrick appealed the trial court's judgment, asserting two assignments of error:

1. The District Court erred in apportioning only ten percent (10%) of the fault to Matthew Morgan.

2. The District Court erred in finding that $250,000.00 was a reasonable award for general damages in this matter.

## ANALYSIS

### I.  *Trial Court's Apportionment of Fault.*

Sheriff Hedrick does not appeal the trial court's determination that he was grossly negligent in his actions, which led to the injuries sustained by Plaintiff. Sheriff Hedrick only asserts Mr. Morgan should have received a higher apportionment of fault.

In *Duncan v. Kansas City Southern Railway Co.*, 00-66, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680-81, the Louisiana Supreme Court explained the standard of review regarding comparative fault determinations as follows:

> As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. [*Clement v. Frey*, 95-1119 (La. 1/16/96), 666 So.2d 607]. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. *Clement*, 666 So.2d at 611; *Coco v. Winston Industries, Inc.*, 341 So.2d 332, 335 (La.1977).

Sheriff Hedrick relies on *Marceaux v. Gibbs*, 96-2839 (La.9/9/97), 699 So.2d 1065, to support his argument that the trial court erred in only imposing ten percent (10%) fault to Mr. Morgan in this case. In *Marceaux*, the inmate was granted trustee status because he was deemed a "model prisoner." While on a work detail, the inmate and another prisoner were able to sneak into a volunteer fireman hut where they were able to find and drink some alcohol that was present. Then, while his supervisor was talking with others, the inmate managed to sneak into his supervisor's vehicle, which had the keys in the ignition, and drove off. In a matter of minutes, the inmate, who was legally drunk, ran a red light and struck the

plaintiff's vehicle. The *Marceaux* inmate was part of a detail of five prisoners the Acadia Parish Sheriff released to the Town of Iota for use on public projects. The Town was required to furnish security for the prisoners, with the provision that the prisoners be directly supervised by a commissioned law enforcement officer. However, on this day, the Town deviated from its prior practice, with only a public works department employee, lacking law enforcement background, in charge of supervision. The district court assigned the inmate thirty percent (30%) fault, the Town sixty-five (65%) fault and the Acadia Parish Sheriff five percent (5%) fault. On appeal, this court reversed the finding of gross negligence on the part of the Acadia Parish Sheriff, and also found the Sheriff was entitled to indemnification from the Town of Iota in accordance with the law. *Marceaux v. Gibbs*, 95-1397 (La.App. 3 Cir. 8/14/96), 680 So.2d 1189, *writ granted*, 96-2839 (La. 1/31/97), 687 So.2d 391. This court also found the inmate was not guilty of an intentional tort, but rather ordinary negligence. After granting writs, the Louisiana Supreme Court affirmed this court's finding that the Acadia Parish Sheriff was not guilty of gross negligence. The Supreme Court then, finding the inmate was not guilty of an intentional tort, reassessed fault to place seventy percent (70%) on the inmate and thirty percent (30%) on the Town of Iota.

*Marceaux* is clearly distinguishable from the instant case as it did not involve gross negligence on the part of the sheriff, nor did it involve an intentional tort on the part of the inmate.

Sheriff Hedrick also cites *Thomas v. Sheridan*, 07-1291 (La.App. 1 Cir. 2/8/08), 977 So.2d 303, where the court assigned fifty percent (50%) fault to both the sheriff and the inmate. In *Thomas*, the inmate had been admitted into the ICU for symptoms of OxyContin withdrawal. He was under the guard of a sheriff's deputy. The inmate's legs were shackled and he was handcuffed. However, to allow him to eat while in the hospital bed, the inmate's left hand was released. After eating,

11

but before re-cuffing the inmate's hand, the deputy approached the bed and the inmate grabbed the deputy's gun with his left hand. The deputy was able to flee the room and alerted authorities. The inmate quickly got out of bed and was able to grab a nurse, and a hostage situation ensued. Eventually the inmate was subdued, and no physical injuries were sustained. However, a suit for emotional damages was filed. The trial court found one hundred percent (100%) fault on the part of the sheriff's office. The first circuit reversed in part, finding fifty percent (50%) fault on both the sheriff and the inmate.

We find the facts in *Thomas* are quite distinguishable from the instant case and not persuasive here. The spontaneous escape of the inmate in *Thomas* was not a confluence of numerous grossly negligent actions on the part of the sheriff's office as we have in this case. It is hard to imagine a more grossly negligent series of events which led to Mr. Morgan's escape from the Concordia Parish Courthouse and the subsequent attack on Plaintiff. It is conceded that Mr. Morgan's past offense as a violent sex offender should have precluded him from any possibility of attaining trustee status. Mr. Morgan also was allowed to mingle among citizens attending a function at the Courthouse while wearing street clothes with no insignia identifying him as an inmate. Most egregious of all, is the uncontroverted fact that a sheriff's deputy simply left his supervisory post to run errands, leaving a group of inmates, dressed in street clothes, wholly unsupervised and able to walk away with no difficulty.

In this case, Sheriff Hedrick and his employees were guilty of gross negligence that directly led to a life-altering attack on the Plaintiff. The failure of Sheriff Hedrick to perform his duty of overseeing the inmate was the proximate cause of Plaintiff's injuries. The Sheriff was by far in the best position to prevent the harm that occurred to Plaintiff. Under these circumstances, we find the trial court

was not clearly wrong or manifestly erroneous in allocating ninety percent (90%) of the fault to Sheriff Hedrick for his department's grossly negligent actions.

## II.    *General Damages.*

The Sheriff also argues the trial court erred in awarding general damages which exceeded the highest reasonable amount Plaintiff may be awarded.    In *Wainwright v. Fontenot*, 00-492, p. 4 (La. 10/17/00), 774 So.2d 70, 74 the court discussed stated the standard to be used by an appellate court when reviewing a quantum award:

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993). Moreover, before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

Even were we to find this award on the high side, we can only disturb the trier of fact's determination if it abused its discretion.  *Youn*, 623 So.2d 1257.  Since the attack, Plaintiff has undergone over three years of professional treatment from four healthcare providers, including three that are experts in treating patients with emotional trauma.    There was no prior history of Plaintiff receiving any psychological treatment.  All the healthcare providers were consistent that Plaintiff suffered from PTSD, which more likely than not would affect her for the remainder of her life.  No medical evidence was presented to counter these findings.  Therefore, considering the life-altering injuries the trial court attributed to the accident, and the uncontradicted testimony of all the healthcare providers that Plaintiff will never fully recover from the effect of the injuries she sustained on February 20, 2019, we do not find the trial court abused its discretion in awarding $250,000.00 in general damages.

See *Lawrence v. Government Employees Ins. Co.*, 13-1296 (La.App. 4 Cir. 10/15/14), 151 So.3d 917, *writ denied*, 14-2382 (La. 2/6/15), 158 So.3d 821.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal in the amount of $7,450.81 are assessed to defendant-appellant, Sheriff David Hedrick.

**AFFIRMED.**